## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE No. | 16-20291 (JJT) |
| | ) | | |
| DIANA R. FRITZSON, | ) | CHAPTER | 7 |
| DEFENDANT. | ) | | |
| | ) | | |
| MATTHEW J. LEFEVRE, | ) | ADV. PRO. No. | 16-02047 (JJT) |
| ADMINISTRATOR C.T.A OF THE | ) | | |
| ESTATE OF KATHERINE F. MESULIS | ) | RE: ECF No. | 1 |
| | ) | | |
| PLAINTIFF | ) | | |
| V. | ) | | |
| | ) | | |
| DIANA R. FRITZSON, | ) | | |
| | ) | | |
| DEFENDANT. | ) | | |
| | ) | | |

## MEMORANDUM OF DECISION AFTER
## TRIAL REGARDING NONDISCHARGEABLE DEBT

### APPEARANCES

Ronald Chorches, Esq.                              Counsel for the Plaintiff
Law Offices of Ronald I. Chorches, LLC
449 Silas Deane Hwy, 2nd Floor
Wethersfield, CT 06109

Kara S. Rescia, Esq.                               Counsel for the Defendant
Rescia & Shear, LLP
5104A Bigelow Commons
Enfield, CT 06082

## I.   INTRODUCTION

This matter comes before the Court on a Complaint (ECF No. 1)[1] filed by Matthew J. Lefevre ("Plaintiff"), Administrator C.T.A. of the probate estate of Katherine F. Mesulis, against the Defendant, Diana R. Fritzson ("Defendant") on June 3, 2016. In the Complaint, the Plaintiff seeks a determination by this Court that an alleged debt owed by the Defendant to the Plaintiff is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and/or (a)(6).[2] The dispute between these parties originates in a prior proceeding in the Superior Court of the State of Connecticut, Judicial District of Hartford where, on September 6, 2012, the Plaintiff initiated an action known as *Lefevre v. Fritzson*, HHD-CV12-6034811-S ("State Court Action") against the Defendant. In that lawsuit, the Plaintiff alleged that the Defendant stole $297,469.38 from her godparents, an aging Katherine and her husband, Anthony Mesulis ("Anthony", collectively with Katherine, "Mesulises") during a time when the Defendant assisted them with their financial and medical care.

Having considered the pleadings, testimony, evidence admitted during trial, the Court's own docket and the arguments of the parties, the Court finds that the Plaintiff met his burden of proof to establish that the alleged debt is nondischargeable under a theory of defalcation pursuant to 11 U.S.C. § 523(a)(4). As to the Plaintiff's claims under the theories of larceny and embezzlement pursuant to 11 U.S.C. § 523(a)(4) and willful and malicious injury pursuant to 11 U.S.C. § 523(a)(6), the Court finds that the Plaintiff failed to meet his burden.

---

[1] All references to the docket of the Adversary Proceeding appear in the following format: ECF No. __.
[2] Unless otherwise noted, all statutory citations refer to the Bankruptcy Code, Title 11, United States Code.

II.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and derives

its authority to hear and determine this matter on reference from the District Court pursuant to 28

U.S.C. §§ 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) and (J).

Venue in this District is proper pursuant to 28 U.S.C. § 1409.

III.    PROCEDURAL HISTORY

On February 26, 2016, the Defendant filed for relief under Chapter 7 of the Bankruptcy

Code. On June 3, 2016, the Plaintiff initiated this Adversary Proceeding advancing six causes of

action against the Defendant.[3] In Counts Three and Four, asserting nondischargeability on the

theories of larceny and embezzlement, the Plaintiff alleges that during the time the Defendant

was supposed to be assisting the Mesulises with their finances, she instead used their assets for

her own personal gain, without authorization to do so. Compl. 5-6, ECF No. 1. The same facts

are alleged in support of the Plaintiff's Count Five, asserting nondischargeability on the theory of

defalcation while acting in a fiduciary capacity, and Count Six, asserting willful and malicious

injury. Compl. 6-7, ECF No. 1. The Defendant answered the complaint by denying most of the

allegations. She pleaded an affirmative defense that the Complaint failed to state a claim upon

which relief could be granted, and asserted that certain of the amounts she received from the

Mesulises were gifts. Answer 20, ECF No. 9.

On October 3 and October 17, 2017, the Court held a two-day trial during which the

Plaintiff and Defendant testified and submitted exhibits into evidence. Following the close of the

record, both parties submitted post trial briefs (ECF Nos. 50-52). On May 2, 2018, the Court

---

[3]  The Plaintiff initially pursued a denial of the Defendant's discharge in Counts One and Two of the Complaint
pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(5). The Plaintiff withdrew those counts on October 19, 2017, following
the second day of trial. *See* ECF Nos. 46 and 54.

reopened the trial to allow the parties to supplement the evidentiary record.[4] On June 27, 2018,

the trial resumed and both the Plaintiff and Defendant again testified and submitted additional

exhibits. The Defendant's expert witness, Sandra Sergeant, RN, also testified on issues related to

the nature and cost of home health care of the elderly. At the conclusion of the trial, the Court

took this matter under advisement.

IV.    FINDINGS OF FACT[5]

In accordance with Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052, after consideration of

the trial testimony and argument, the documents admitted into evidence, and examination of the

official record of the instant Adversary Proceeding, the Court finds the following facts.

## **Background**

1. The Mesulises' home was located at 91 Clearfield Road, Wethersfield, Connecticut 06109 ("Property"). Def. Ex. 1 and 5.

2. In 1971 when the Defendant was a child, her parents moved to a home across the street from the Mesulises. Tr. 1, 3:19.

3. Over the years, the Defendant maintained a longstanding, nearly familial relationship with the Mesulises. At the age of 16, the Defendant became Katherine's goddaughter. Compl. ¶ 9; Answer ¶ 9; Tr. 1, 3:23.

4. The Mesulises often gave monetary gifts to the Defendant during her childhood, and later to her family and children for graduations, holidays, weddings, and other special occasions. Tr. 1, 3:31-32, 3:23-27.

5. The Mesulises had no natural born children. Compl. ¶ 7; Answer ¶ 7.

6. Katherine was diagnosed with Parkinson's disease in the late 1980s to early 1990s, when she was in her sixties. Tr. 1, 3:07-3:08, 3:22.

---

[4] The Order reopening the record directed the parties to address the following: a) the amount of time and precise nature of the care the Defendant gave to or for the benefit of Anthony Mesulis and/or Katherine Mesulis from January 2009 to November 2011 and the reasonable or fair value of the Defendant's services related thereto; and b) the nature, value and amount of any gifts allegedly given by Anthony Mesulis and/or Katherine Mesulis in lieu of compensation for services provided from January 2009 to November 2011. *See* ECF No. 60.

[5] The Court's findings of the underlying facts are drawn from the parties' pleadings and trial exhibits, the docket of the Adversary Proceeding, and the record of the three day trial held on October 3, 2017 (ECF No. 42), October 17, 2017 (ECF No. 45), and June 27, 2018 (ECF Nos. 71 and 72). References to the audio recording of the trial will appear in the following format, respectively: Tr. 1, __, Tr. 2, __, Tr. 3, __, Tr. 4, __.

7.  In 2003, the Mesulises hired a woman named Patricia Borchetta ("Ms. Borchetta") to periodically clean their home. They also hired her son, Kevin Yade ("Mr. Yade"), to assist with yardwork, snow removal and other household maintenance. Tr. 1, 3:41-43. Anthony and Mr. Yade developed a close relationship. Tr. 1, 3:59. At some point, Anthony gifted Mr. Yade his antique Mercedes automobile. Tr. 1, 2:22; Tr. 2, 3:46.

8.  The Plaintiff is an attorney, in good standing, licensed to practice in the State of Connecticut. Tr. 1, 0:18. On June 4, 2008, the Plaintiff prepared the wills of Anthony and Katherine for execution. Tr. 1, 1:44; Def. Ex. 2 and 3. The Defendant was named a one-half beneficiary in Katherine's will. Tr. 1, 0:30. Mr. Yade was named beneficiary of the other half. *Id*; Def. Ex. 2.

9.  Anthony's will left all of his assets to Katherine, but if she predeceased him, his estate would be left in equal shares to the Defendant and Mr. Yade. Def. Ex. 3.

10. At the same time the Mesulises executed their wills, they also signed Connecticut Short Form Power of Attorney documents appointing their tax preparer, Robert Fochi ("Mr. Fochi"), as their attorney-in-fact. Compl. ¶¶ 11, 18; Answer ¶¶ 11,18.

11. On June 24, 2008, a few weeks after the wills were executed, Ms. Borchetta filed a report with the Wethersfield Police Department alleging that the Defendant was taking advantage of the Mesulises, and that her son, Mr. Yade, noticed that the Defendant was receiving large amounts of money from them, and was spending too much on groceries. Def. Ex. 1. After speaking with the Mesulises, the Plaintiff, the Defendant and the live-in caregiver, the police determined that there was no ostensible wrongdoing on the part of the Defendant. *Id*.

12. The execution of the wills and subsequent events strained the relationship between the Defendant and Mr. Yade.[6]

13. Anthony died on January 27, 2009 at the age of 87.  Tr. 1, 0:21. Anthony was "sharp" until his death. Tr. 2, 0:25. His assets were bequeathed to Katherine by operation of his will. Tr. 1, 0:32.

14. Katherine died on November 23, 2011 at the age of 89. Compl. ¶ 6; Answer ¶ 6; Tr. 1, 0:19, 1:03-1:04. At the time of her death, Katherine was in declining physical and mental health.  Tr. 1, 0:19-21.

15. The Mesulises' home was free and clear of all liens prior to Anthony's death. Tr. 1, 0:56; Def. Ex. 5.

### The Defendant's Relevant Background

16. At all relevant times, the Defendant lived at 4 Emily Road in Marlborough, Connecticut 06447 with her husband and two children.

---

[6] Despite being present during the first trial day, Mr. Yade did not testify.

17. The Defendant maintained employment as a senior administrative assistant at an insurance company called The Hartford, and worked roughly thirty to forty hours per week. Tr. 2, 2:37, Tr. 3, 1:34-35. She declined two promotions so she could maintain the flexible hours her job afforded her in order to continue caring for the Mesulises when they needed her. Tr. 1, 3:55; Tr. 3, 1:35.

18. The Defendant maintained a joint checking account at People's United Bank (the "People's Account") with her husband. Tr. 2, 0:26-27, 1:47-1:48; Def. Ex. 7 and 8. Only the Defendant's income was deposited into the People's Account.

19. The Defendant's net monthly income from the Hartford was $3,800.00 and was direct deposited into the People's Account. Tr. 2, 2:37-2:38; Def. Ex. 8.

20. The Defendant's monthly mortgage payment was $2,071.00, and was paid out of the People's Account. Tr. 2, 2:38-2:39; Def. Ex.  8. The Defendant's monthly car payment was roughly $742.13, and was also paid out of the People's Account. *Id*.

### **The Mesulises' Financial  Accounts**

21. At all relevant times, Katherine maintained a Buell Individual Retirement Account ("IRA"). Pl. Ex. A.

22. At all relevant times, the Mesulises maintained a Buell Joint Securities Account. Pl. Ex. B. After Anthony died, the funds were transferred to Katherine's Buell Securities Account, and the Joint Account was closed. Tr. 1, 0:35-36, 1:29; Pl. Ex. B.

23. At all relevant times, Katherine also maintained a Buell Securities Account (collectively, with the IRA and the Joint Securities Account, the "Buell Accounts"). Pl. Ex. C.

24. At all relevant times, the Mesulises' financial advisor at Buell Securities was William Cusack ("Mr. Cusack"). After Mr. Cusack's death in June 2008, Chris Berris ("Mr. Berris") succeeded him. Tr. 1, 0:40-43; Pl. Ex. A-C.

25. At all relevant times, the Mesulises maintained a joint checking account at Sovereign Bank (the "Sovereign Account"). Pl. Ex. D.

26. Katherine held and utilized an AT&T Universal Credit Card (the "Credit Card"). Tr. 1, 0:59-1:00; Pl. Ex. E.

### **The Defendant's Management of the Mesulises' Medical Care**

27. In 2005, at age 83, Katherine's health began to decline. She developed an infection that caused her to be confused and required hospitalization. Thereafter, she was placed in a nursing home. Tr. 1, 3:34. After her hospitalization, Katherine "wasn't the same." Tr. 1, 3:49.

28. Anthony pleaded with the Defendant to have Katherine removed from the nursing home and returned home. Tr. 1, 3:34. The Defendant had several meetings with the nursing home staff that spanned over a few months. The nursing home eventually released Katherine on the express condition that the Defendant assure that she receive adequate health care at home. Tr. 1, 3:34-3:35; Tr. 2, 0:11.

29. When Katherine was released, the Defendant promised Anthony that she would do whatever was necessary to keep Katherine home and provide for all of her needs. Tr. 1, 3:49. Anthony was unable to care for Katherine on his own because he was "slowing down", and increasingly relied upon the Defendant for his care. Tr. 1, 3:35-3:36.

30. From that point onward, the Defendant was responsible for Katherine and became her "voice." Tr. 1, 3:35. Katherine required fulltime assistance around the clock. Tr. 1, 3:54; Tr. 2, 19:30. The Defendant made the home handicap-accessible by lifting the bed and toilet, clearing paths to the bathroom, and installing railing throughout the home. Tr. 2, 0:13-16.

31. The Defendant coordinated the interviewing, hiring and management of the Mesulises' various live-in aides. Tr. 1, 3:37; Tr. 2, 0:11. After many failed attempts to hire an aide that was a good fit for the Mesulises, in 2008, the Defendant hired Harriet Owoo ("Harriet") from a health care agency called Right at Home, and she became the Mesulises full-time live-in aide. Tr. 1, 3:36-37, 3:50-53.

32. From 2005 to 2011, the Defendant often received phone calls from the Mesulises during the day. She visited their home several times per week, often during her lunch break, and at times stayed overnight. Tr. 1, 3:54; Tr. 2, 19:30.When the live-in aide was unavailable, the Defendant provided care for both Anthony and Katherine including toileting, bathing, dressing, bandaging bedsores, arranging medical equipment and other tasks. Tr. 3, 0:50-52; Def. Ex. 9.

33. Because neither the Mesulises nor their aides were able to drive, the Defendant scheduled and provided transportation for all of the Mesulises' medical visits. She also picked up their prescriptions, groceries, clothing, and generally addressed all of their household needs. Tr. 1, 3:54; Tr. 2, 19:30.[7]

### The Defendant's Management of the Mesulises' Finances Prior to Anthony's Death

34. Starting when she was in high school, the Defendant helped Anthony balance his checkbook and continued to do so throughout the years. Tr. 1, 3:29.

35. Around the time Katherine fell ill, the Defendant agreed to assist Anthony with the Mesulises' financial affairs, including paying their bills and expenses. Compl. ¶¶14-15; Answer ¶¶14-15; Tr. 2, 0:22. The Defendant also helped Anthony gather and send bank statements and other financial documents to Mr. Fochi to prepare their annual tax returns. Tr. 2, 0:55-56.

---

[7] The Defendant's testimony regarding the evolution of care, commitments, tasks and efforts she provided on behalf of the Mesulises was largely unchallenged at trial.

36. Anthony consulted Mr. Cusack every month to determine how much stock should be liquidated to cover the Mesulises' monthly expenses. Tr. 2, 0:22.

37. Anthony subsequently informed the Defendant of the amount to be liquidated or withdrawn from the Buell Accounts or the Sovereign Account and endorsed checks in that amount to the Defendant. Tr. 1, 1:13; Tr. 2, 0:24, 0:30. Anthony then instructed the Defendant regarding how to allocate the funds to pay for the Mesulises' expenses. Tr. 2, 0:24-25, 0:31.

38. The Defendant received between $5,000.00 and $10,000.00 each month in checks from Anthony. Tr. 2, 0:38; 41-42; Def. Ex. 7 and 8. The Defendant was entrusted with those funds to pay the Mesulises' ongoing ordinary, extraordinary, and necessary living expenses. Tr. 1, 3:07.

39. The Defendant routinely deposited the checks made payable to her by Anthony into her People's Account. When she did not deposit the checks, she cashed them. Tr. 2, 0:26-29, 1:47-1:48; Def. Ex. 7 and 8.

40. All payments made to the Right at Home agency were written by Anthony or the Defendant and came out of the Buell Accounts or the Sovereign Accounts. Pl. Ex. D and H.

41. The Defendant gave Anthony the receipts from her expenditures on the Mesulises' behalf and discussed with him the amount she spent on those items. Tr. 2, 0:36.

42. Anthony intended for the Defendant to keep some portion of the money, beyond what was necessary to pay for the Mesulises' expenses, to compensate her for her time and service to them. Tr. 2, 0:22-23, 30, 32-33.

43. The Defendant never asked Anthony how much money was left in the Buell Accounts or the Sovereign Account or otherwise sought to ascertain the balance of any of their accounts. Tr. 2, 0:39, 55, 1:38-42.

### The Defendant's Management of the Mesulises' Finances After Anthony's Death

44. Shortly after Anthony's death, Mr. Berris became the financial advisor assigned to the Buell Accounts. Mr. Berris corresponded solely with the Defendant regarding the Buell Accounts and only called the Mesulises' home when he knew the Defendant was be present. Tr. 2, 0:42.

45. Katherine wrote checks monthly to the Defendant to cover her expenses. Tr. 2, 0:41. At some point, Katherine became unable to write checks due to her physical and mental ailments, and the Defendant wrote them for her. Tr. 3, 2:34.

46. The Defendant also began to utilize Katherine's Credit Card. Tr. 2, 1:07; Pl. Ex. F.

47. The Defendant kept few, if any, receipts of her expenditures for Katherine. Tr. 2, 2:30; Def. Ex. 7.

48. The Defendant did not track any of her cash expenditures for Katherine. *Id*.

49. The Defendant continued to retrieve and send bank statements to Mr. Fochi for the preparation of Katherine's tax returns. Tr. 2, 0:55-56. The Defendant did not review the bank statements or ask Mr. Fochi about the state of Katherine's finances. Tr. 2, 1:43.

50. The Defendant never asked Mr. Berris how much was left in the Buell Accounts or otherwise sought to ascertain the balance amount. Tr. 2, 0:39, 55, 1:38-42.

### The Reverse Mortgage

51. Some time late in 2011, Mr. Berris informed the Defendant that there was only $60,000.00 to $70,000.00 remaining in the Buell Accounts. Concerned about the sufficiency of those funds, the Defendant contacted Mr. Fochi to secure a reverse mortgage ("Reverse Mortgage") on the Property. Tr. 2, 0:58.

52. Katherine did not have the legal capacity to sign for the Reverse Mortgage. Tr. 2, 2:55.

53. In September 2011, two months prior to Katherine's death, the Reverse Mortgage in the amount of $94,000.00 was secured by the Property and signed for by Mr. Fochi. Tr. 2, 0:56.

54. The Reverse Mortgage funds were fully or almost fully advanced, and the net proceeds were placed in Mr. Fochi's possession, as power of attorney, in an account at Rockville Bank. Tr. 1, 0:58, 1:46, 2:17-18. The Plaintiff's law firm reviewed the loan documents and conducted the closing. Tr. 1, 2:16.

55. Using the proceeds from the Reverse Mortgage, Mr. Fochi made all of the remaining payments to the Right at Home agency.  Tr. 2, 2:56-2:57.

56. By the time of Katherine's death two months later, Mr. Fochi had expended $72,000.00 of the Reverse Mortgage proceeds for the Right at Home agency fee, Katherine's unpaid bills, and some of her living expenses. Tr. 1, 2:19. Def. Ex. 5.

### The Defendant's Expenditure of Funds from Katherine

57. From the time of Anthony's death in January 2009 to Katherine's death in November 2011, the Defendant received $305,769.36 in checks signed by Katherine. Def. Ex. 7; Tr. 2, 2:21-2:22, 2:47. On almost every occasion that the Defendant deposited a check, the Defendant's People's Account balance was zero, or was overdrawn.  Tr. 2, 1:51-2:21; Def. Ex. 8.

58. With the funds that the Defendant cashed, she routinely spent in excess of $1,000.00 throughout the month on groceries and hundreds of dollars each month at Walmart. [8] Def. Ex. 7. The Defendant also spent hundreds of dollars each month on gas and fast food.[9] *Id.*

59. The Defendant purchased groceries for Harriet, and "bought whatever was on the grocery list" Harriet gave her. Tr. 2, 0:46-52; Def. Ex. 7. The Defendant also gave Harriet approximately $2,000.00 each month in cash, in addition to the Right at Home agency fee, and made recurring payments to AT&T for Harriet's cell phone bill. Tr. 2, 3:50-52, 46; Def Ex. 7.

60. The Defendant also used the Mesulises' funds to make a monthly car payment for her Mercedes Benz sports utility vehicle ranging from $680.00 to $742.00, car repairs and maintenance in excess of $1,500.00, and a vehicle trade-in payment of $3,500.00. Def. Ex. 7; Tr. 2, 2:28-29.

61. Among the other extraordinary payments made from the People's Account were payments to Quinnipiac University for textbooks and a meal plan for the Defendant's adult daughter, recurring monthly payments to a tanning salon for the Defendant and her daughter, payments to GameStop for her son's video games, as well as charges made in Kittery, Maine; Portsmouth, New Hampshire; Block Island, Rhode Island; Cape Cod, Massachusetts; and Las Vegas, Nevada where the Defendant was on vacation. Tr. 1:48-1:50; Def. Ex. 8.

62. Using Katherine's Credit Card, the Defendant incurred charges at restaurants near the location of the Defendant's home, as well as additional charges for groceries, gas, and purchases at Walmart. The Defendant also incurred charges at nail salons, and made cash advances of approximately $700.00. Tr. 1, 1:06-1:09; Ex. F.

63. In January 2011, Katherine's IRA held a value of $46,485.51. Tr. 1, 0:35, 1:24-1:28; Pl. Ex. A. By June 2011, all of the funds in the IRA were either spent or withdrawn. Tr. 1, 0:35, 1:24-1:28; Ex. A.

64. The Mesulises Joint Securities Account, which had a balance of $325,474.56 one month after Anthony's death in February 2009, was entirely depleted by September 2011. Tr. 1, 0:36, 1:30; Pl. Ex. C.

65. By November 7, 2011, two weeks prior to Katherine's death, the Defendant had only $278.60 in her People's Account. Tr. 2, 2:21-2:22; Def. Ex. 8.

66. Without looking at the Mesulises' bank accounts or otherwise ascertaining their remaining balances, the Defendant contracted Katherine's funeral arrangements in the amount of $15,900.00. Tr. 1, 0:51.

---

[8] For example, in July 2011 alone, the Defendant spent approximately $1,839.00 on groceries. Def. Ex. 7. In December 2010, the Defendant spent approximately $1,187.00 at Walmart. *Id.* The Debtor also made other routine purchases at stores like CVS, Walgreens and Rite Aid. *Id.*

[9] The Debtor made several purchases for gas each month, frequenting gas stations as often as twenty times within a thirty-day period.

67. Of the $305,769.36 the Defendant received from Katherine, approximately $175,759.00 was expended on Katherine's ongoing ordinary, extraordinary and necessary expenses.[10] Def. Ex. 7; Tr. 2, 2:21-2:22, 2:47; Def. Ex. 9. At least $130,010.36 of the funds were kept by the Defendant and used for her own expenses. *Id.*

68. The Defendant and her family received an additional $24,500.00 as gifts for holidays and other occasions. Def. Ex. 9.

69. At no point in time did the Defendant ask Mr. Cusack or Mr. Berris how much was left in the Buell Accounts, or otherwise seek to ascertain the balance amount. Tr. 2, 0:39, 55, 1:38-42.

70. The Defendant did not report her receipt of $130,010.36 to the Internal Revenue Service ("IRS") or the Connecticut Department of Revenue Services ("DRS"). Tr. 2, 1:46. The Defendant did not cause any of the Mesulises' gifts to her to be reported to the IRS or DRS, or enlist Mr. Fochi to do so. *Id.*

### The Plaintiff's Investigation and Administration of the Probate Estate

71. The Plaintiff was named Administrator C.T.A. for Katherine's probate estate on December 21, 2011. Tr. 1, 0:19, 0:21.

72. At the time of Katherine's death, the value of the remaining assets held by the probate estate was $40,445.52. Tr. 1, 0:49; Def. Ex. 5.

73. Despite an appraised value of $177,000.00, the Property was sold for only $122,000.00 because of its state of disrepair and a pending foreclosure instituted by the Reverse Mortgage lender. Tr. 1, 2:37-2:39; Def. Ex. 5.

74. The probate estate had a debt from the Credit Card in the amount of $12,000.00, a line of credit obligation of approximately $4,500.00, a debt of $93,942.48 from the Reverse Mortgage, some unpaid utility bills, unpaid taxes, and an unpaid funeral bill of approximately $15,900.00. Tr. 1, 0:50.

75. When the Plaintiff initially began his investigation, he received cross claims from the Defendant and Mr. Yade who both asserted that the other received inappropriate sums of money from the Mesulises. Tr. 1, 2:05. The Plaintiff contacted the Defendant, who apprised him of her close relationship with the Mesulises and her responsibilities overseeing their care and well-being. Tr. 1, 1:18, 1:56; Def. Ex. 4.

76. The Plaintiff independently requested and received bank records for the Buell Accounts and Sovereign Account from each respective financial institution for the period between Anthony and Katherine's deaths. Tr. 1, 0:33. Pl. Ex. A-C.

---

[10] The evidence shows that this amount exceeds what was ostensibly spent for Katherine's dietary and household needs. *See supra* Section V.

77. After noting that the most significant assets were transferred to the Defendant, the Plaintiff sent a letter to the Defendant on or around January 29, 2012, listing all of the transfers made to her, and asked her to explain the purpose and use of the transfers. Tr. 1, 0:40-41. The Defendant did not respond to the Plaintiff's letter. Tr. 1, 0:41.

78. The Plaintiff wrote to Mr. Yade or his counsel, Robert Ludgin ("Attorney Ludgin") on the same day, and asked why Mr. Yade received approximately $10,000.00 from the Mesulises. Tr. 1, 0:40-42, 2:06. The Plaintiff was able to corroborate from Mr. Yade or his counsel that Mr. Yade received payments for yardwork, snow plowing, and other tasks, and was satisfied regarding the legitimacy of those payments. Tr. 1, 0:41-42, 2:07.

79. On March 2, 2012, the Plaintiff wrote a status report to the probate court in which he noted the amounts of money transferred by the Mesulises to the Defendant and to Mr. Yade, and stated that at the time, there was no indication that such payments were not in accordance with the desires of the Mesulises.[11] Def. Ex. 4.

80. Despite numerous requests by the Plaintiff, the Defendant failed to respond, provide the requested documentation or cooperate in any way with the Plaintiff's investigation of Katherine's probate estate. Tr. 1, 1:01-1:02, 1:36; Tr. 2, 2:31.

81. Based upon the Defendant's lack of cooperation, the Plaintiff began a thorough analysis of the Buell Accounts and the Sovereign Account. Tr. 1, 1:02. The Plaintiff thereafter sought and obtained probate court approval to hire Attorney Ludgin on a contingency basis on behalf of the probate estate, and initiated the State Court Action against the Defendant. Tr. 1, 2:39-40.

82. After retaining counsel in the State Court Action, the Defendant provided her bank statements to her attorney. Tr. 2, 1:26. At some point during the State Court Action, the Defendant's counsel provided the Defendant's bank statements to Attorney Ludgin. Tr. 1, 2:41-43; Tr. 2, 1:26.

83. No compilation, accounting, or comprehensive narrative of the wide range of expenditures of the Mesulises' funds was provided by the Defendant to the Plaintiff until this trial in the Adversary Proceeding.

---

[11] The Report also noted that Mr. Yade indicated to the Plaintiff that he wrote checks to himself and endorsed Katherine's name on them. Def. Ex. 4.

V.    CONCLUSIONS OF LAW

A.  Section 523(a) Generally

The Supreme Court has held that in order to prevail on a claim of

nondischargeability under Section 523(a), the plaintiff has the burden of proving all

elements of each asserted claim for relief by a preponderance of the evidence. *See Grogan v.*

*Garner,* 498 U.S. 279, 291 (1991); *Bethpage Fed. Credit Union v. Furia (In re Furia),* 77

F.3d 622, 624 (2d Cir. 1996). "[E]xceptions to discharge are to be narrowly construed and

genuine doubts should be resolved in favor of the debtor." *Denton v. Hyman (In re Hyman)*, 502

F.3d 61, 66 (2d Cir. 2007). This is consistent with the fresh start policy of the Bankruptcy Code.

*See Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the

Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate' debtor.").

B.  Count Five—Defalcation While Acting in a Fiduciary Capacity

Bankruptcy Code Section 523(a)(4) excepts from discharge any debt "for fraud or

defalcation while acting in a fiduciary capacity, embezzlement or larceny." *See* 11 U.S.C. § 523.

To prevail on a claim of fiduciary defalcation under Section 523(a)(4), two elements must

be proven: "(i) the existence of a fiduciary relationship between the Plaintiff and Defendant;

and (ii) a defalcation committed by the Defendant in the course of that relationship."

*Beaulieu v. Fox (In re Fox)*, 2017 WL 564499, at *3 (Bankr. D. Conn. Feb. 10, 2017);

*Mirachi v. Nofer (In re Nofer)*, 514 B.R. 346, 353 (Bankr. E.D.N.Y. 2014). The Court will

address each element in turn.

1.    Fiduciary Relationship

"The question of whether a defalcation has occurred is reached only when the

threshold determination that the debtor acted in a fiduciary capacity has been made." *Andy*

*Warhol Found. v. Hayes (In re Hayes)*, 183 F.3d 162, 170 (2d Cir. 1999). The Bankruptcy

Code does not define the term "fiduciary" for purposes of Section 523(a)(4). *Yankowitz Law*

*Firm v. Tashlitsky (In re Tashlitsky)*, 492 B.R. 640, 644 (Bankr. E.D.N.Y. 2013) (citing

*Hayes*, 183 F.3d at 167). The precise scope of the term is a matter of federal law, and the

"the federal law definition of fiduciary is different from—and more restrictive than—the

traditional common law definition." *Snyder v. Murphy* (*In re Snyder)*, 3:17-CV-00840 (SRU),

2018 WL 1914923, at *5 (D. Conn. Apr. 23, 2018) [hereinafter "Snyder II"] (internal quotations

omitted) (citing *Harper v. Richey* (*Matter of Richey)*, 103 B.R. 25, 31 (Bankr. D. Conn.

1989)).

It is accepted that a fiduciary relationship under Section 523(a)(4) "generally involv[es]

express trusts, technical trusts or statutorily imposed trusts". *Grow Up Japan, Inc. v. Yoshida (In*

*re Yoshida)*, 435 B.R. 102, 108 (Bankr. E.D.N.Y. 2010). "An express trust is initiated by one

entity's transfer of property to another entity coupled with a manifestation of an intention to

create a trust." *First American Title Ins. Co. v. Eberhart (In re Eberhart)*, 283 B.R. 97, 100

(Bankr. D. Conn. 2002), *aff'd*, 124 Fed. Appx. 672 (2d Cir. 2005). "The fiduciary relationship

must exist prior to the act creating the debt; a trust relationship cannot be said to arise merely

from the wrongful conduct itself." *Parklex Assoc. v. Deutsch (In re Deutsch)*, 575 B.R. 590, 600

(Bankr. S.D.N.Y. 2017).

Although a fiduciary relationship under Section 523(a)(4) is usually limited to the trust

relationships noted above, other relationships may also, in limited circumstances, be within the

scope of Section 523(a)(4). *See Artis v. West (In re West)*, 339 B.R. 557, 566 (Bankr. E.D.N.Y.

2006) ("[T]he fiduciary connection arising from a technical or express trust does not exhaust the

universe of fiduciary relationships that fall within the ambit of § 523(a)(4).") (citing *Hayes*, 183

14

F.3d at 168-69). In the context of Section 523(a)(4), the Second Circuit has indicated that two

parties are in a fiduciary relationship when there is "a difference in knowledge or power between

fiduciary and principal which . . . gives the former a position of ascendancy over the latter",

*Hayes*, 183 F.3d at 167, and other courts in this circuit have accordingly followed suit. *See*

*Syncom Industries, Inc. v. Wood (In re Wood)*, 488 B.R. 265, 276 (Bankr. D. Conn. 2013); *In re*

*Snyder*, 2017 WL 1839122, at *1 (Bankr. D. Conn. May 5, 2017) [hereinafter "Snyder I"], *aff'd*,

2018 WL 1914923 (D. Conn. April 23, 2018); *In re Fox*, 2017 WL 564499, at *3. Moreover,

while the "exception is a question of federal law, its application frequently turns upon

obligations attendant to relationships governed by state law." *Hayes*, 183 F.3d at 166.

"Under Connecticut law, a fiduciary relationship is characterized by a unique degree of

trust and confidence between the parties, one of whom has superior knowledge, skill or expertise

and is under a duty to represent the interests of the other." *Martinelli v. Bridgeport Roman*

*Catholic Diocesan Corp.*, 196 F.3d 409, 429 (2d Cir. 1999) (quoting *Dunham v. Dunham*, 204

Conn. 303, 322 (1987), *overruled in part on other grounds*, 239 Conn. 207, 213 (1996)). "In the

seminal cases in which the Connecticut Supreme Court has recognized the existence of a

fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a

relationship of dependency, or was under a specific duty to act for the benefit of another."

*Dennis v. Hall (In re Hall)*, 483 B.R. 281, 292 (Bankr. D. Conn. 2012) (quoting *Hi–Ho Tower,*

*Inc. v. Com–Tronics*, Inc., 255 Conn. 20, 38, (2000)).

Here, the Court concludes from the entire evidentiary record in this Adversary

Proceeding that an express trust was created. According to the Defendant's testimony, Anthony

asked the Defendant to help bring Katherine home and assist the Mesulises with their financial

affairs and medical care. The Defendant readily obliged and promised Anthony that she would

15

do whatever was necessary to ensure that Katherine's financial, physical, and medical needs were met. Pursuant to this agreement, Anthony wrote checks to the Defendant every month to pay the Mesulises' ordinary, extraordinary and ongoing expenses, and those checks were deposited into the Defendant's People's Account. By all accounts, when Anthony transmitted, and the Defendant accepted, checks that were agreed by both parties to be used to pay the Mesulises' expenses, an express trust was created.

The undisputed facts also show that the Defendant was a fiduciary of the Mesulises under Connecticut law. The Defendant's dominant position over, and relationship of dependency with, the Mesulises is manifest throughout the record. By the Defendant's own admission, she was the Mesulises' "voice" and "spoke for them…in a medical capacity". Tr. 1, 3:55. That the Defendant turned down two job promotions in order to maintain a schedule that allowed her to visit the Mesulises multiple times throughout the week demonstrates their relationship of trust and dependency.

With respect to Anthony, the Defendant testified that in addition to helping him with his finances, she occasionally provided care for him, including toileting, bathing and dressing, bringing him to his medical appointments, picking up his prescriptions, and coordinating the interviewing and hiring of the live-in aides. It is clear from the record that as Anthony advanced in age, he heavily relied upon the Defendant to meet his basic needs.

With respect to Katherine, the Defendant testified that following her hospitalization, Katherine was in need of consistent attention and care, and the Defendant became her "voice" from that point forward. Tr. 1, 3:35. Katherine's dependence upon the Defendant was further magnified following Anthony's death. The record demonstrated that as Katherine's Parkinson's disease advanced, she became increasingly physically and mentally vulnerable up until the time

16

of her death. Katherine lost the capacity to sign for the Reverse Mortgage, and the Defendant

needed to contract Mr. Fochi as power of attorney to sign on her behalf. Similarly, when

Katherine could no longer write checks to pay for expenses, the Defendant testified that she

wrote them for her. The Defendant alone managed Katherine's bank accounts, and the

Mesulises' financial advisor consulted only with her. Undeniably, the Defendant was in a

position of ascendancy and dominance over Katherine.

It is abundantly clear from the record that the relationship between the Defendant and the

Mesulises was "characterized by a unique degree of trust and confidence between the parties,

one of whom has superior knowledge, skill or expertise and is under a duty to represent the

interests of the other." *Martinelli*, 196 F.3d at 429. Therefore, as a matter of both federal and

state law, this Court holds that the Defendant was a fiduciary of the Mesulises.

2.    Defalcation

Having found that the Defendant acted as a fiduciary for the purposes of Section

523(a)(4), the Court must now determine whether the Plaintiff met his burden of proving

that the Defendant committed a defalcation in the course of that relationship. As described in

Section 523(a)(4), "defalcation refers to a failure to produce funds entrusted to a fiduciary and

applies to conduct that does not necessarily reach the level of fraud, embezzlement or

misappropriation." *In re Hall*, 483 B.R. at 294 (quoting 4 Alan N. Resnick & Henry J. Sommer,

Collier on Bankruptcy ¶ 523. 10[1][b], p. 523–71 (16th ed.). "At minimum, 'defalcation,' as that

term is used in [S]ection 523(a)(4), embraces misappropriation by a fiduciary." *In re Stone*, 94

B.R. 298, 300 (S.D.N.Y. 1988), *aff'd*, 880 F.2d 1318 (2d Cir. 1989). Where the other terms of

the section—fraud, embezzlement and larceny—all require a showing of actual intent,

defalcation does not. *See Hyman*, 502 F.3d at 68.

17

In *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013), the Supreme Court clarified that defalcation requires "a culpable state of mind" in the form of intentional, knowing, or reckless conduct. Where actual knowledge of wrongdoing is lacking, courts "consider conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Id.* at 274 (internal quotations omitted) (quoting ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985)). "By requiring the courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation, the standard . . . insures that the harsh sanction of non-dischargeability is reserved for those who exhibit some portion of misconduct." *In re Kakareko*, 575 B.R. 12, 27 (Bankr. E.D.N.Y. 2017) (quoting *Hyman*, 502 F.3d at 68–69).

The Court is convinced that a defalcation has occurred in this case and that the Plaintiff has met his burden of proof. While there is no evidence of actual intent or knowledge of wrongdoing, the record is replete with the conscious disregard, recklessness and willful blindness that the defalcation standard requires. The Court's findings are predicated both on the evidence presented and the Defendant's lack of credibility, *see Shao Ke v. Jianrong Wang*, 5:13-CV-1203-GTS, 2014 WL 4626329, at * 4 (N.D.N.Y. Sept. 15, 2014), with regard to the recklessness of her diminution of the Mesulises' assets, the extraordinary amount of monies expended by her, and the inconsistent and incredible rationalizations she used to justify the excessive expenditures of the finite monies of the aged and vulnerable people in her care.

First, the Defendant admitted that between Anthony's death on January 27, 2009 and Katherine's death on November 23, 2011, she received direct payments in the form of checks in the total amount of $305,769.36, expended $175,759.00 for Katherine's benefit, and kept the remaining $130,010.36 for herself. Tr. 2, 1:45-46, 2:45-47; Pl. Ex. G; Def. Ex. 7; Def. Ex. 9.

18

Unsurprisingly, the Defendant was unable to produce a single receipt for any of the $175,759.00 she allegedly spent on Katherine's behalf, and was otherwise unable to corroborate any of her expenditures. It was only upon this Court's urging during trial—five years after the State Court Action—that the Defendant created a compilation (the "Compilation"), which summarized purchases the Defendant purportedly made for Katherine's living and household expenses. Def. Ex. 7. The Compilation shows that following Anthony's death, the Defendant expended several thousands of dollars on groceries, gas, food, bills, car payments and other expenses, all of which the Defendant would have this Court believe were to or for the benefit of the aged and ailing Katherine.[12]

For example, the Defendant regularly spent several hundreds of dollars a month on groceries, and some months spent close to $2,000.00. *See* Def. Ex. 7. By the Defendant's own admission, she went to the grocery store four to five times per week and "bought whatever was on the grocery list" that Harriet gave her. Tr. 2, 0:46-52; Def. Ex. 7. This list also included Harriet's own groceries—and the Defendant admittedly "didn't question" a single item before she made the purchases. *Id*. Looking at the Compilation, it is clear that the Defendant was spending hundreds of dollars—if not thousands—over what was necessary for Katherine's dietary or household needs. Moreover, by the Court's estimation, the amount of money the Defendant spent on groceries after Anthony's death steadily increased and peaked immediately prior to Katherine's death, at a time when her health was rapidly failing. The Defendant advanced no tenable explanation for these excesses, and it is therefore reasonable to infer that the benefits of these spending sprees benefited someone other than Katherine.

---

[12] The reliability of this document is highly suspect given that it lists the amounts all of the Defendant's cash expenditures, of which the Defendant testified she kept no receipts, made six to eight years prior to trial.

Among the other reckless expenditures reflected on the Compilation were regular trips to Walmart where the Defendant routinely spent hundreds of dollars each month, purportedly on Katherine's toiletries and undergarments. The Compilation also shows recurring payments to AT&T, which the Defendant testified were for Harriet's cell phone bill, and trips to Best Buy, which were for new televisions and telephones for Katherine and Harriet. The Defendant also admitted that she relied on Katherine's checks to make her regular car payments which ranged from $680.00 to $742.00 monthly, as well as car repairs for her vehicle totaling $356.27, and a vehicle trade-in payment of $3,500.00. Def. Ex. 7; Tr. 2, 2:28-29. The evidence shows that the $175,759.00 the Defendant claims to have spent on Katherine's expenses encompassed purchases that were clearly to or for the benefit of individuals other than Katherine.

The Defendant also testified, and her bank statements confirm, that she made incurred charges for her benefit, and that of her children. For example, the Defendant testified to making payments to Quinnipiac University for her daughter's college text books and meal plan. Similarly, the Defendant made monthly payments to a tanning salon that she testified she and her daughter visited, as well as charges at GameStop for her son. Other various payments include astounding personal charges incurred in Maine, New Hampshire, Cape Cod, Las Vegas, and Block Island, all during times that the Defendant testified she was on vacation.

Furthermore, in addition to the large amounts the Defendant was already spending from the Buell Accounts and the Sovereign Account, the Defendant also made frequent expenditures on Katherine's Credit Card. The Credit Card statements show regular purchases at grocery stories, Walmart, and many of the same stores the Debtor admittedly frequented for Katherine's household expenses. Pl. Ex. E.

20

The Defendant attempted to minimize the profligacy of her spending by her explanation that when he was alive, Anthony, and later, Katherine, authorized many of the purchases and intended the Defendant to use some of the funds they gave her as appreciation for her efforts. For example, according to the Defendant, the Mesulises wanted to pay for many of Harriet's expenses[13] because they grew to love her and desired to incentivize her to continue working for them. In a similar fashion, the Defendant claimed that the Mesulises wanted to pay for her gas and car payments because of how often she drove to their home, and gifted her richly because she was forced to spend so much time away from her family in order to care for them. These sentiments, while natural and conceivable, have been to some troubling extent exaggerated by the Defendant. While the Court credits that the Mesulises intended to "compensate" or "gift" the Defendant for her services, the Defendant's explanations are undercut both by the frequency, consistency, and extravagance of her purchases, as well as Katherine's declining physical and mental health condition during the time these purchases were made.

Most alarming here is that the Defendant admittedly made no effort to check the Mesulises' account balances at any point in time, or to temper her patently disproportionate excesses. The Defendant testified that she never knew the balances and did not believe it was her responsibility to ask, despite being the primary person drawing on the Mesulises' accounts, managing their funds, paying their bills, and receiving thousands of dollars' worth of gifts from them. This evidence reflects a willful blindness, recklessness and conscious disregard of a substantial and unjustifiable risk that the Defendant's conduct would violate her fiduciary duty. That risk is of such a degree that, "considering the nature and purpose of the actor's conduct and

---

[13] The Defendant used the Mesulises' funds to pay for Harriet's phone bill and groceries, and also paid her roughly $2,000.00 per month in cash, in addition to the $6,000.00 to $7,200.00 that the agency charged the Mesulises monthly for Harriet's services.

the circumstances known to [her], its disregard involves a *gross deviation* from the standard of

conduct that a law-abiding person would observe in the actor's situation." *Bullock*, 569 U.S. at

274 (quoting Model Penal Code § 2.02(2)(c), at 226).

Furthermore, when asked to account for her expenditures by the Plaintiff in the probate

court, the Defendant frustrated every one of the Plaintiff's attempts to administer Katherine's

probate estate and wholly failed to provide him an accounting of her expenses, in violation of her

fiduciary duty. Given the totality of the circumstances discussed above and the controlling case

law, both elements of fiduciary defalcation for purposes of Section 523(a)(4) have been proven.

C.   Count Four—Embezzlement

Bankruptcy Code Section 523(a)(4) excepts from discharge any debt committed in the

commission of embezzlement. *See* 11 U.S.C. § 523. "Embezzlement, for the purposes of

Section 523(a)(4), is defined by federal common law as the fraudulent appropriation of

property by a person to whom such property has been entrusted, or into whose hands it has

lawfully come." *Conn. Attorneys Title Ins. Co. v. Budnick (In re Budnick)*, 469 B.R. 158,

176 (Bankr. D.Conn. 2012) (internal quotations omitted). In order "[t]o prove

embezzlement, the creditor must show by a preponderance of the evidence (1) that the

Defendant appropriated the subject funds for his own benefit; and (2) that he did so with

fraudulent intent or deceit." *Id.* "[F]raudulent intent may be determined from the facts and

circumstances surrounding the act." *3N Int'l Inc. v. Carrano (In re Carrano)*, 530 B.R. 540,

558 (Bankr. D. Conn. 2015).

Here, the first element is easily met. By the Defendant's own admission, she kept at least

$130,010.36 of the Mesulises' funds for her and her family's benefit, and arguably availed

herself of more, and gave additional amounts of money to Harriet. The second element, however,

requires heightened scrutiny of the trial record. The Plaintiff's contention that the Defendant is

guilty of embezzlement because "she took funds that were entrusted to her for the ordinary and

necessary care of Mesulis and…kept at least $156,000 of it for own personal use", is unavailing,

as it does not prove that she did so with fraudulent intent. Pl. Post Trial Brief at 12. It was

unrefuted at trial that the Defendant expended several hours weekly caring for the Mesulises, and

the Plaintiff's Administrator Report supports the same: "[b]y all accounts Ms. Fritzson did

indeed oversee and coordinate the care of the Decedent and her late husband Anthony over

the years." Def. Ex. 4. The Defendant, unchallenged, also testified that the Mesulises

intended for her to keep a portion of what they gave her as gifts or compensation. The

amount, and to what extent, the Mesulises truly intended to gift the Defendant, however,

remains unanswered by the trial record, and it is a close question whether the evidence in

this case demonstrates, by a preponderance of the evidence, that the Defendant

misappropriated any portion of the $130,010.36 with fraudulent intent, as opposed to

expending the funds with a reckless disregard or willful blindness, as detailed above.

Accordingly, the Plaintiff has not met his burden of showing that the Defendant committed

embezzlement pursuant to Section 523(a)(4).

D.  Count Three—Larceny

Bankruptcy Code Section 523(a)(4) excepts from discharge any debt created by the

commission of a larceny. *See* 11 U.S.C. § 523. "Larceny is the fraudulent and wrongful taking

and carrying away of the property of another with the intent to convert the property to the

taker's use without the consent of the owner." 4 Alan N. Resnick & Henry J. Sommer, Collier

on Bankruptcy ¶ 523.10[2], p. 523-77 (16th ed.); *see Ramos v. Rivera (In re Rivera)*, 217

B.R. 379, 385 (Bankr. D. Conn. 1998). "Section 523(a)(4) and Connecticut law require a

showing of 'fraudulent intent' in the wrongful taking of the property of another." *FDIC v.*
*Roberti* (*In re Roberti*), 201 B.R. 614, 621 (Bankr. D. Conn. 1996). As distinguished from
embezzlement, the original taking of the property must be unlawful. *See Balzano v. Farina*
*(In re Balzano)*, 127 B.R. 524, 533 (Bankr. E.D.N.Y. 1991).

Here, the Plaintiff has not met his burden of proving that the Defendant committed
larceny. The record shows that the Defendant came into possession of the Mesulises' funds
from the Buell Accounts and Sovereign Account through checks that were written by
Anthony or Katherine, pursuant to their agreement with the Defendant to assist them in
paying for their ongoing expenses. To the extent the Defendant wrote the checks herself, the
record supports that the Defendant did so in furtherance of her agreement with the
Mesulises, and was authorized by them to do so. The Court was not otherwise presented
with any evidence showing that the Defendant's initial possession of the funds was unlawful
or without consent, as required by the section.[14] Accordingly, the Plaintiff has failed to meet
his burden of proving larceny under Section 523(a)(4).

E.   Count Six—Willful and Malicious Injury

Under Section 523(a)(6), a debt will be nondischargeable if obtained by "willful and
malicious injury by the Defendant to another entity or to the property of another entity". 11
U.S.C. § 523. "The terms 'willful' and 'malicious' are separate elements, and both elements
must be satisfied." *Hough v. Marguiles (In re Margulies)*, 541 B.R. 156, 161 (Bankr. S.D.N.Y.
2015). "The 'willfulness' element requires that a plaintiff prove 'a deliberate and intentional
*injury*, not merely a deliberate or intentional act that leads to injury.'" *Snyder I*, 2017 WL

---

[14] Although it is unclear under what circumstances the Defendant came into possession of the Credit Card, the
Court has not adduced fraudulent intent or unlawful possession of the Credit Card from any of the facts before
it.

1839122, at *11 (emphasis added) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)).

Next, the "malicious" element means "wrongful and without just cause or excuse, even in the

absence of personal hatred, spite or ill-will." *Navistar Fin. Corp. v. Steulluti (In re Stelluti)*, 94

F.3d 84, 87 (2d Cir. 1996). "[M]alice may be easily deduced where the debtor's conduct giving

rise to liability has no potential for economic gain or other benefit to the debtor, from which one

could only conclude that the debtor's motivation must have been to inflict harm upon the

creditor." *Wood*, 488 B.R. at 280 (internal quotations omitted). "However, in cases where a

Defendant seeks profit or some other benefit, the underlying conduct, however deplorable, would

not give rise to liability under § 523(a)(6) in the absence of some additional, aggravating conduct

on the part of the Defendant of sufficient gravity to warrant an inference of actual malice under

[*Stelluti*]". *Id.*

The Plaintiff has not proven that a willful and malicious injury has occurred here. Rather,

as explained above, the Defendant's conduct meets the standard of recklessness, and does not

reach the requisite level of intentionality required under Section 523(a)(6). *See Kawaauhau*, 523

U.S. at 64 ("Negligent or reckless acts…do not suffice to establish that a resulting injury is

'wilful and malicious.'"). Although it is clear that the actions taken by the Defendant ultimately

*resulted* in an injury, the record is devoid of sufficient evidence to support that the Defendant

acted with the requisite intent to cause such injury.

Neither do the surrounding facts and circumstances support a finding of maliciousness.

"Malice requires conduct more culpable than that which is in reckless disregard of the creditor's

economic interests and expectancies." *Econ. Dev. Growth Enters. Corp. v. McDermott (In re*

*McDermott)*, 434 B.R. 271, 283 (Bankr. N.D.N.Y. 2010). A defendant's "knowledge that he or

she is violating the creditor's legal rights is insufficient to establish malice absent additional

aggravating circumstances." *Id*. The Defendant's reckless spending and failure to check the

Mesulises account balances, without more, cannot support a finding of malice. Even if the

Defendant knew that she was violating the Mesulises' best financial interests and nonetheless

acted, that knowledge, in the absence of any additional aggravating circumstances, is insufficient

to show a malicious intent. Moreover, the Court credited the Defendant's unassailed testimony—

albeit, mistaken and unreasonable—that she was not required to keep abreast of the Mesulises'

bank accounts given that the Mesulises engaged financial professionals.

Furthermore, it is evident that the Defendant was motivated to act for her own economic

gain, as she had come to rely on certain of the funds given to her by the Mesulises to pay her

own bills. That conclusion is supported by the Defendant's testimony that she had grown

accustomed to the fiscal generosity that the Mesulises had shown her over the years. For the

above reasons, the Plaintiff's claim cannot be excepted from the Defendant's discharge under

Section 523(a)(6) as a debt for willful and malicious injury.

F.   Amount of Nondischargeable Debt

As explained above, it is unrefuted here that the Defendant provided care to the

Mesulises, and the Court credits her testimony that they intended to "compensate" her, at some

level, for her services. During the last day of trial, the Defendant submitted into evidence a

purported accounting of the time and value she expended for their care.[15] The only reliable

metric of the value of the Defendant's services that entered the record came from the

Defendant's expert witness, who testified to the standard industry rates of Patient Care Assistants

("PCAs") and Certified Nursing Assistants ("CNAs") during the relevant time period. Based on

---

[15] According to the Defendant, the value of her services is $109,5548.50. Def. Ex. 9.

26

the rate of $12.00 per hour, with a total of 2,527 hours worked[16], the Court concludes that the

reasonable value of the Defendant's services from January 27, 2009 to November 23, 2011 is

$31,308.00. Therefore, after subtracting $31,308.00, together with $175,759.00, the amount the

Defendant spent for Katherine's expenses, from the $305,769.36 received from Katherine, this

Court finds that the amount of the Defendant's nondischargeable debt owed to the Plaintiff is

$98,702.36, exclusive of any cognizable prejudgment interest, legal fees, costs and expenses.

VI.   CONCLUSION

For the reasons stated above, the Plaintiff has met his burden of proving, by a

preponderance of the evidence, that the Defendant committed a defalcation while in a fiduciary

capacity. Accordingly, a debt of $98,702.36 is nondischargeable pursuant to 11 U.S.C. §

523(a)(4), and judgment shall enter in favor of the Plaintiff on Count Five of the Complaint. As

to Counts Three, Four and Six, judgment shall enter in favor of the Defendant.

Dated at Hartford, Connecticut this 10th day of August 2018.

James J. Tancredi
United States Bankruptcy Judge
District of Connecticut

---

[16] The expert testified that during 2009 to 2011, PCAs made $12.00 to $14.00 per hour, and CNAs made $10.00 to $12.00 per hour, pursuant to the industry standard. Tr. 3, 0:24-26. Given the Defendant's testimony that she did not expect compensation for her services and did most of her work gratuitously, the Court will use an average of $12.00 per hour, multiplied by the number of hours the Defendant worked as reported in Defendant's Exhibit 9, to calculate her fair compensation. The $12.00 hourly rate is particularly appropriate given the frequent doubling of caregivers and costs thereof.